## ROBINSON *versus* CRENSHAW.

1. A note executed by one, to a woman, as a compromise of proceedings against · him for bastardy, is valid, and of sufficient consideration to sustain a recovery at law.
2. That a note, payable to one or bearer, was given for the compromise of a proceeding for bastardy, is not an available defence, against its recovery, in the hands of an innocent holder.
3. The statute of 1812,[a] on the subject of promissory notes, &c., does not embrace, in its provisions, a note payable to *bearer*, so that the illegality of the consideration of such note, can be a vailable as a defence against its recovery, in the hands of a *bona fide* innocent holder.

The questions arising on this case, came before the County court of Autauga, by appeal from the judgment of a justice of the peace, of that county. The defendant in error, as bearer, commenced an action on a joint note, executed by Robinson, and one Ethridge, and payable to Nancy Crenshaw. Robinson, alone, was sued; and, in defence to the action, he plead special matter, averring that the note sued on, had been executed as a compromise of a prosecution, instituted by Nancy Crenshaw, against Ethridge, for bastardy. The court, on demurrer to this plea, ruled the same bad, and judgment was had, in favor of the plaintiff below. The case having been brought to this court by writ of error, two questions were raised for consideration, viz.

1. Was the consideration of the note valid and binding in law.

2. Could such defence be available against the note, in the hands of an innocent holder.

*Erwin,* for the plaintiff—*Goldthwaite, contra.*

a Aikin's Digest, page 328—§6.

SAFFOLD, J.—A trial was had in the County court of Autauga, in the nature of an appeal from the judgment of a justice of the peace. The cause of action was a promissory note, payable to Nancy Crenshaw, or bearer, due about one month before the commencement of the suit, signed by said Robinson and John Ethridge—the former, alone, having been sued. The suit having been brought by the defendant in error, as *bearer*, Robinson, the original defendant, filed his plea in the County court, averring, that "the note was given on an illegal contract, and one which was against public policy, viz: a prosecution for bastardy, was then pending, instituted against the said John Ethridge, for getting the said Nancy Crenshaw with child, and it was agreed between the said Nancy and said Ethridge, that the prosecution should be stopped, and that she should not appear to swear said child against him, and upon no other consideration was said note given." To which the plaintiff demurred—the court sustained the demurrer, and rendered judgment for the plaintiff.

The decision on demurrer is the cause assigned for error.

The record and arguments present for consideration, two questions of some difficulty.

1. Was the contract valid, or illegal and void?

2. If the defence was otherwise available, could it prevail against the original plaintiff, who sued upon the note, merely as *bearer?*

It is argued, against the legality of the contract, that the consideration was an agreement to suppress a prosecution, by bribery, after it had been commenced, and one, which public policy required should be prosecuted. In support of the contract, it is insist-

ed, the consideration was neither illegal nor immoral.—That, the mother being the natural guardian of her child, has the right to its custody, and is bound for its support, unless she, by her own voluntary act, subject the father to its support; and, that she is liablefor the costs, if she fail in an attempt to fix its paternity on the person charged.

I recognise the true principle to be as declared by *Thompson*, J., in delivering the opinion of the Supreme court of N. York, in the case of *Belding* vs. *Pitkin*,[a] that, "whenever the consideration which is the ground of the promise, or the promise, which is the effect or consequence of the consideration, is unlawful, the whole contract is void." This is believed to be the utmost extent to which the doctrine of illegality has been carried, and as far as it is sustainable. <sup>a Caine's Rep. 147.</sup>

Then, to test the facts of this case by this rule, what is the result? The plea on demurrer is to be assumed as true. It states, in substance, that pending the prosecution, it was agreed between the parties that the same should be stopped, and that the party complaining would not appear, to swear against the accused, and this was the consideration. Whether or not this agreement was illegal, must depend on the solution of another question : was the injured female under any legal compulsion to commence or continue the prosecution ? It is scarcely contended she was; and I confidently assume the position, that she was not.—No such power of coercion has been delegated to any officer or tribunal.

We should not be deluded by the term "prosecution," as used in the record, because it is also applicable to indictments—for, could that be material, it is

not to be found in the statute, under which the pro-
ceedings were had.    It is true, the statute denomi-
nates the person charged, as the *accused,* and the com-
plaint a *charge ;* yet, these terms are of very dubious
import : also, the magistrate before whom such com-
plaint has been made, after the accused has been
brought before him, if sufficient cause appear, is re-
quired to bind him to appear at the next County
court; and, in the mean time, to be of good behav-
iour.    This recognizance, to appear at court, seems,
however, to partake no less of the nature of bail, in
civil, than criminal cases.    The proceeding is of a
nature essentially different from an ordinary crimi-
nal prosecution, even for a misdameanor.  The statute
provides, that when any single woman shall make
complaint as prescribed, the justice of the peace shall
issue process, &c., and cause the person accused of
being the father of the child, to be brought before
him.    Upon his appearance, the justice shall exam-
ine the female touching the charge ; and, if sufficient
cause appear, shall bind him, as already mentioned.
The county court, upon his appearance, shall cause
an issue to be made up, and tried by jury.    If found
against the imputed father, the court shall give judg-
ment against him, to pay, not exceeding fifty dollars
yearly, for ten years, for the benefit of the child :
and he shall give bond and security for the payment
thereof—the bond to be payable to the court, and the
money subject to its direction, so that it be not paid
to the mother of the child.    *If the issue be found
against the woman, she shall pay all costs.*

Thus, from the directions of the statute, and the
nature of the subject, it results that the mother, in
all such cases, is vested with a full discretion to make

complaint, or not; and, after making the charge, to prosecute, or abandon it, at pleasure. Nor can it be denied, that, in a great majority of cases, (consequently we must presume it in this) the mother is much more interested in the recovery, than the child and all the world besides. Though she is not directly to receive the money, she is, by the laws of nature and society, entitled to the custody, and, if able, bound for the maintenance of her children; and, as she is to be presumed able, the judgment, in the event of a recovery, would have been partially or wholly for her benefit: and, doubtless, the statute so intended it, and for that reason, confided the matter to her discretion. It must be viewed as a very remote and contingent interest, that the county or public had in the subject, and as the indemnity depended on the volition of the injured female, I conceive little or no importance should be attached to it. But, if from this view alone of the subject, I could question the legality of the consideration, when examined under another aspect, it is less doubtful.

The other view is this: the female to whom the note was given, had been seduced into immorality and vice; she was degraded in society; her health had been affected, and herself rendered the less able to provide the means of support; the fruits of her illicit intercourse must create an additional tax on her resources and industry, unless aided by him on whom nature had imposed an equal obligation,—these are the obvious and unavoidable consequences of her situation. The principal in the note, by giving the same, admitted himself to be the despoiler; and as such bound to repair the injury, at least, in part. Then, could there be any thing illegal or *con-*

*tra bonos mores,* after the perpetration of the vice, in contracting to divide the additional expense, and make partial remuneration for the injury, by providing a more ample support, than the mother otherwise had, for the innocent offspring? The case would be entirely different, had the contract been made, in consideration of any illegal or immoral act, to be done in future—such are admitted to be void.: law, and public policy, imperiously require they should be so, in order to discourage them. But not so, with regard to what has already passed; a sense of honor and justice may prompt a man to contract atonement for his wrong; and though, in this way it may arise *ex turpi causa,* the inducement to the contract being an immoral or illegal act done, it is yet available.

The doctrine is believed to be well sustained by numerous authorities, that " a promise, in consideration of past cohabitation;" or " a promise to indemnify a sheriff for an illegal act, already committed, is good and valid."—*Holman* vs, *Johnson.*[a] The case of *Turner* vs. *Vaughan,*[b] was on a bond, given in consideration of past cohabitation: the court decided it to be good in law. *Bathurst,* Justice, in delivering his opinion in this case, says, " Where a man is bound in honor and conscience, God forbid, that a court of law should say the contrary; and wherever it appears that the man is the seducer, the bond is good." He invokes the authority of Holy writ, Exodus, ch. xxii: v. 16, that, " if a man entice a maid that is not betrothed, and lie with her, he shall surely endow her to be his wife." Deut. ch. xxii: v. 28, 29—" If a man find a damsel that is a virgin, which is not betrothed, and lay hold on her and lie with her, and they be found, then the man that lay with her, shall

[a] Cowper, 343. [b] 2 Wils. 339.

give unto the damsel's father fifty shekels of silver, and she shall be his wife : because he hath humbled her, he may not put her away, all his days."

· The two cases mainly relied on, to establish the illegality of this contract, are believed to be clearly distinguishable from it.    In the case of *Wheeler* vs. *Russell*,[a] the consideration of the note was a quantity [a]17 Mass. of shingles, sold by the plaintiff to the defendant, [a]R. 258. which were not of the quality required by the statute of that State.    There, the sale of shingles which were not of the statute dimensions, or, if not surveyed, of whatever dimensions, is expressly prohibited, under the penalty of forfeiture; and both seller and buyer are declared liable to a penalty, if sold without being surveyed.    These shingles had neither been surveyed, nor were they of the statute dimensions.    The contract was adjudged illegal and void.    The difference is obviously this : the sale of the shingles was expressly prohibited, under forfeiture and penalty, yet it was the identical act and consideration for which the note was given.    To have sustained the contract, would have been sanctioning a palpable violation of the statute, and defeating the public policy contemplated by the prohibition.

In the other case, *Buck* vs. *Buck*,[b] it seems to have been held, that no action would lie, to recover money in relation to the transfer of shares in the British ale brewery, a company, prohibited by an English statute, although no proceedings had been had under it, for eighty-seven years, and very few knew of its existence.    There, the only difficult question was, whether or not the law had become obsolete : the court decided it had not—which was altogether different from any question in this case.    Admitting

the law to exist, they might well refuse to recognise any contract for the transfer of shares in a company, the existence of which the law had prohibited.— This decision, then, rests precisely on the principle of the other.

In this case, as there was no compulsion on the female to complain to the public, or to continue the prosecution when commenced, and no other person could do so, so, there could be no inhibition against a private contract to repair the injury done—such a contract could have no tendency to encourage any future vice or immorality, consequently does not come within the reason of the rule, which avoids contracts for illegality. Neither "the consideration, which was the ground of the promise, nor the promise which was the effect, or the consequence of the consideration, was unlawful."

The distinction respecting the consideration, as contended for by the counsel for the plaintiff in error, has not escaped notice, " that the note was not given to secure reparation for any damages sustained, but merely for the discontinuance of the prosecution." The one can not be viewed abstractly from the other, and being inseparable, the distinction can not prevail. The object of the proceedings, was to recover from the despoiler a partial indemnity for the past—the object of the contract was to effect the same thing in a different form. That the indemnity thus intended to be secured, was to be paid to the mother, instead of being subject to the direction of the county court, is by no means conclusive, for the reasons mentioned, that she had full discretion, and was most essentially interested. To these views, may be added the consideration, that from the nature of

the charge, the result of an issue in court, would have been more or less doubtful, and she had a right to draw her own conclusions respecting it. In pressing the prosecution, she must have been exposed to severe scrutiny, satire and reproach, before a public tribunal, and gazing audience, when, perhaps, she had not become entirely callous to her own disgrace.—— These are sufficient reasons, and are probably the true ones, why the legislature deemed it proper to leave the matter in the discretion of the injured female, either to complain to the public, to secure reperation by private contract, or to struggle in silence, by her own means, for the support of herself and issue, and leave the paternity in obscurity.

As I do not understand the principle to be contested, that a promise, founded on the consideration of a past injury of this kind, is valid. I consider it unnecessary to add farther authority on that point: and in answer to other objections made, besides the references given, I cite only the case of *Coventry* vs. *Barton*,[a] which was also relied on by the plaintiff in error, but which I think is against him. It was there held, [a] 17 John, R 142. that if one request, or direct another, to do an act, which he knows at the time will be a *trespass*, and promise to indemnify him, the promise is *void;* but if the party who does the act at the instance of another, does not know at the time, that he is commiting a trespass, the promise to indemnify is *valid*.—— This was the opinion of the court, as delivered by *Spencer*, Ch. J. In the same, he recognizes the doctrine, that the common law prohibits every thing unjust or *contra bonos mores*, and that a contract contravening these principles is void. But, says he, " if one person requests another to enter into B's land,

and in his name, to drive out the beasts, and impound them, and promise to save him harmless, this is a good *assumpsit*, though the act is tortious." He fully maintains the position, that the validity of promises of indemnity, depends on the fact, whether or not the act to be indemnified, was known at the time to to be a trespass. In this case, could the private contract be declared illegal, and the female's knowledge thereof be deemed material, it does not appear that she possessed such knowledge.

But it is farther objected, that supposing the proceedings to have been discontinued, and the money paid, they could have been re-commenced and prosecuted, and the law would not sustain an action to recover back the consideration of the compromise.

The answer to this objection is, that a violation of the contract, in the manner suggested, at any time before the payment or collection of the money, would have constituted a legal defence against the demand; but a violation afterwards, would leave the payor, only in the same condition, he would have occupied, had he paid the money when he made the contract : in neither case could it be recovered back. It is also true, that money paid on an *illegal* contract, which the law would not enforce, can not be recovered back, for *in pari delicto, melior est conditio defendentis.* But in such cases, it is generally immaterial, whether the terms of the contract be violated or not, for as far as there is any difference, a violation would receive more countenance from the law, than a compliance by committing the illegal act. Cases may occur, in which money paid for an illegal act, afterwards to be done, may be recovered back in an action rescinding the bargain before the perpetration of the deed. The po-

licy of the law in this respect, is to encourage penitence, and the rescision of such contracts, in time to avoid the crimes. These considerations, I think, sufficiently disprove the analogy between this contract and such as are illegal; and remove the difficulty supposed to arise from the possibility of a violation of this agreement.

Again – it is to be observed, that the amount, if any, to be recovered at law, is left, under all the circumstances, to the full discretion of the county court, so as not to exceed fifty dollars per annum, for ten years; but as much less as may be deemed just and proper. Evidence of a judicious compromise between the parties, and reasonable reparation made, would constitute a material feature in such a case. It is improbable that the putative father would pay or promise any thing considerable to the mother, unless he deemed her worthy of the confidence to be reposed. If he should, however, it is highly proper he should do so at his own risk; and courts should not be *astute* for quibbles on which to exonerate him. If he has exercised a proper discretion, and paid an adequate sum, or even less, it is but a fair presumption, that the county court, in the event of a future prosecution, would regard the accommodation *in mitigation* of the amount, so that in this way it might be reduced to a *nominal* sum.

The effect would be similar to that of an accommodation between the individuals in an assault and battery, or other personal violence by one on the other. The private satisfaction made by the offender to the person aggrieved, would not only be a bar to an action for the civil injury, but would be evi-

dence in mitigation of *the fine,* under an *indictment* for the public wrong, and such is the constant practice.

Though the position is not boldly assumed, that the female could legally be compelled to commence, or continue the prosecution for the bastardy, it has appeared extremely embarrassing to the arguments denying the legality of the contract, to avoid that position; or, to admit the obvious distinction between a case of this kind, and an indictment for felony or misdemeanor. The apparent necessity of blending them in support of that argument, goes far, in my conception, to destroy its force. Hence, I arrive at the conclusion, that so far from containing an inhibition, the statute was intended as a weapon, placed in the hands of the mother, subject to her discretionary use, as the least exceptionable, and most efficacious mode of repairing the injury to herself and society. The putative father is also allowed his discretion to adjust the complaint with the female, should he deem it prudent to do so; otherwise, he may refuse, and abide the judgment of the court, thereby placing the sum beyond her control.

I am, therefore, of opinion, that this contract was valid and recoverable : and such is the opinion of a majority of the court.

Under this opinion, it is immaterial to this case, to decide the second question presented; but, as it is important, in principle, and has been elaborately discussed, we think it proper to express our opinions upon it, also.

2. This remaining question is, whether, admitting the defence to be available against the person named as payee, is it equally so against the plaintiff, suing as *bearer ?*

The statute of 1812, "concerning the assignment of bonds, notes," &c. provides "that all bonds, obligations, bills single, promissory notes, and all other writings for the payment of money or any other thing, shall and may hereafter be assigned by endorsement, whether the same be made payable to the order or assigns of the obligee or payee, or not; and that the assignee shall and may sue in his own name, and maintain any action which the obligee or payee might or could have sued or maintained thereon, previous to assignment; and that in all actions to be commenced and sued upon any such assigned bond, note," &c. "the defendant shall be allowed the benefit of all payments, *discounts*, and sets-off, made, had or possessed against the same, previous to notice of the assignment."

It is conceded, that notes payable to bearer, as this is, are as fully embraced by the statute, in their original state, as any other bonds or notes can be: indeed it would be impossible to deny it, unless through the absurd position, that notes drawn payable to an individual or bearer, are not assignable by endorsement by the payee. Nor can it be denied with any degree of plausibility, that this note, had it been endorsed to A. Crenshaw, would have been subject to the full operation of the statute; consequently, the maker would have had a right to impeach the consideration; or to have availed himself of any payment, or set-off, against the note, previous to notice of the assignment. If such would not have been his privilege under this statute, relative to payment, the consequence is, that it has authorised the most palpable fraud, by depriving the maker of a clear common law right, while it professes to recognise no instru-

ment mentioned in it, as being strictly. negotiable.
I present this view of the statute to shew, that with
respect to payments made, as well as in some of its
other features, to be noticed, it is only declaratory of
the common law, and that if the other grounds of
defence contemplated by the statute, are to be pre-
cluded under an assignment by delivery, instead of
an endorsement, such must also be the fate of pay-
ments.

It has been ruled in many cases, by this court,
that the term " discount," as used in the statute, ex-
tends, by just construction, to all legal objections to
the consideration of such contracts, as are therein
provided for. Such also is the construction of a sta-
tute, similar in this respect, in Virginia, by the court
of appeals of that state.—*Norton* vs. *Rose.*[a] But as
this point has not been contested, on this occasion, I.
assume it as one sufficiently established.

The contested principle is, whether the circum-
stance of the note having been sued on, by the plain-
tiff, as bearer, instead of indorsee, can preclude en-
quiry into the equity of the note, and deny to the
maker the privilege of defence, on the ground of ille-
gality, or want of consideration. To contend that the
consideration can not be impeached, is to maintain
that the obligation of the maker to pay a note in this
form, founded on a void consideration, depends on the
manner of. assigning it; that by *indorsing* it, the.
payee opens the equity for the benefit of the maker;
but by transferring it by *delivery* merely, all enquiry
into the equity is denied: or it may be even worse—
that the right of defence is dependent on the voli-
tion and machination of the holder as indorsee, whe-
ther he will sue as indorsee, or strike out the indorse-

a2Wash.R. 233.

ROBINSON *vs.* CRENSHAW.

ment, which he has a clear right to do,[a] (*Smith* vs. *Clark*,—*United States* vs. *Barker*[c]) and sue as' bearer. If the payee will indorse the note, and the assignee will sue as indorsee, the instrument is not entitled to the protection of a *negotiable* note, and the defence is available ; but if from an impression that an indorsement is immaterial, from inadvertence, fraudulent design, or any other motive, the indorsement was in the first instance omitted, or is subsequently stricken off, the defence is precluded. The same rule must also apply to any defence of payment or set-off, made or possessed even previous to notice of the assignment by delivery : the law places them all on the same ground, as far as this question is concerned. Such is the common law, respecting matter of defence, against negotiable paper, arising previous to its maturity. The statute connects each of these grounds of defence under precisely the same right. And let it be recollected that a transfer by delivery, is no less an "assignment," than if it were by indorsement—such is the current language of the law.

While I deny not the power of the legislature to sanction such inconsistency and iniquity, I contend it has not done so; and that unless this be found to be the obvious import of the statute, it is irrational to suppose such to have been its intention.

The act of 1807, " to render promissory notes and cotton receipts negotiable," &c. was similar to the English statute of 3rd and 4th *Anne,* so far as it related to promissory notes ; but so far, it was entirely repealed by the above recited act of 1812. That cotton receipts, (as decided by this court,[d]) remain negotiable, according to the provisions of the

[a]3 Kent's C 59.
[b]Peake's N P. R. 225.
[c]1 Paines R. 156.

[d]2 Stewart, 137.

former act, is perfectly immaterial to this question; they are provided for by the second and third sections of that act, which remain in full force, while the subsequent act expressly repeals so much of the former "as in any manner concerns promissory notes."

The idea that a note, in this state, is *negotiable* in strict legal acceptation, in its original formation; but that its negociability may be destroyed by an indorsement, is believed to be sufficiently refuted by a3 Bur. the doctrine of the case, cited in argument, of *Grant* 1516. vs. *Vaughan* : it was brought by the bearer against the drawer of a check, in this form : " Pay ship Fortune, or bearer, £70." The check having been lost by the person to whom it was delivered, it came honestly into the hands of the plaintiff, in the way of trade. The declaration contained a count on the instrument, and another, for money had and received. In that case, Lord *Mansfield* observes, " it is a question of law, whether a bill or note be negotiable or not. It appears in the books, that *these notes are by law negotiable;* and the plaintiff's maintaining his action or not, depends upon the question whether such a note is negotiable or not." Referring to the opinion of Lord *Holt*, before the statute of *Anne*, he further remarks, " the objection was to bringing an action upon the note itself as upon a specialty; but I do not find it any where disputed, that an action upon an *indebitatus assumpsit* generally, for money lent, might be brought on a note payable to one, or order." Again, he says, "but upon the second count, the case is quite clear, beyond all dispute; for undoubtedly, an action for money had and received, to the plaintiff's use, may be brought by the *bona fide* bearer of

a note made payable to bearer.    There is no case to the contrary.    It was certainly money received for the use of the original advancer of it ; and if so, it is for the use of the person who has the note as bearer."

Mr. Justice *Wilmot*, in the same case,  also says, whether such  bills or notes as this is, are *in their own nature, negotiable, is a point of law.* " But this is a negotiable note ; and the action may be brought in the name of the *bearer.*    Bearer is *descriptio personæ ;* and a person may take by that description as well as by any other.    In the nature of  the contract, there is no impropriety in his doing so.  ` It is a contract to pay the bearer,  or the person  to whom `he shall deliver it, (whether it be a note or a bill of exchange,) and it is repugnant to the *contract,* that the drawer should object that the  bearer has no right to demand payment from him,"

Mr. Justice  *Yates* also said : " Nothing can be more peculiarly negotiable  than a draft or bill payable to bearer ; which is *in its nature payable from hand to hand, toties quoties.*"'

It has not escaped me, that the case from which the above extracts are taken, was  urged in argument in support of the opposite principle.    It is relied upon to sustain the position, that a note  payable to *bearer,* is a negotiable instrument; and if without indorsement, is exempt from the operation of the statute of 1812.

a3 Burr. R. 1523, 1526, 1528— and 2 Starkie's Ev  126.

If the material question in this case was,  whether the note was or was not originally negotiable at common law, and was *res integra,* I would incline to the affirmative ; and also to place notes payable to one, *or order*, in the same class, notwithstanding the contrary opinion of Lord *Holt,* and other distinguished jurists, and the  necessity  of passing  the statute of

*Anne* to quiet the difficulty. Yet it is necessary to observe, that since the passage of the statute the negociability of such paper has been uniformly referred, in England and the United States, to *that statute*, and similar ones adopted in the different states of the union. The different legislatures have regarded that, as the source of the authority. Hence we find that our legislature in 1807, viewing the subject in the same light, adopted the statute of *Anne*; and that it provides no less for the *negotiability* of notes payable to one, *or bearer*, than others in any different form. In as much then, as the subsequent legislature of 1812, deemed it necessary and proper, to repeal so much of the former act " as in any wise concerns promissory notes;" and to make entirely different provisions for " all promissory notes," it appears to me to be doing violence to the reason and spirit of the latter act, to say, that notes payable to A. B. or bearer, and indorsed, are still negotiable ; or that in their original state, they are so, but that an indorsement (the usual mode of negotiation) will destroy their negotiable character.

But it is also worthy of remark, that in the case of *Grant* vs. *Vaughan*, the paper to " pay ship Fortune, or bearer, £70," which was the foundation of the action, and in reference to which, the language quoted, was used, was considered, as it should have been, rather in the nature of a check, or bill of exchange, or bank note passing as money, than a common promissory note. It is true, the judges sometimes entitled the paper *a note*, as well as a check, but it will be found, on a review of most of the early cases on bills or notes, that the word *note* was often used as a generic term, to include either bills or notes proper, and

so it was in this case. This indefinite use of the term, has thrown great mystery over the true character and nature of promissory notes in the early stages of jurisprudence. In the present improved state of the science, it would be a gross *misnomer*, to speak of a paper, like that to the " ship Fortune," as a *promissory note.* For this difference, and from the effect of the several statutes referred to, I think the case of *Grant* vs. *Vaughan*, can afford but little aid in determining the negotiability of the note now sued on.

I have introduced that case to shew, not only that it does not decide the legitimate character of this note; but also to prove that, what instruments are or are not negotiable, depends on their *original formation*, and the law of the land; and that whether they be so or not *is a question of law*, determinable *by the court*, and not by *the payee* or *indorsee*—That to allow an assignment, by a common indorsement, whether in blank, or in full, which is the usual mode of negotiating paper, to destroy its negotiability, would be an anomaly in jurisprudence. If then, it be even admitted, that by the more correct construction of the common law, the parties to promissory notes, should have been deemed competent, by the terms of their contracts, to render them negotiable, by drawing them payable to A. B. *or order, or bearer*, my proposition still remains unshaken; for their original formation and the law, constituted the criterion of negotiability ; and I think it has been sufficiently demonstrated, that our statute of 1812, with its reference to that of 1807, (which is a copy of the statute of Anne) has determined the character and legal effect of *all promissory notes*; and has placed all on precisely the same footing, as respects their negotiability.

This effect, expressed and implied, I take to be simply this; that all *bonds, notes, &c.* might thereafter "be assigned by indorsement, whether the same be made payable to the order or assigns of the obligee, or payee, "*or not,*" the import of the latter words "or not," must be, *or to him merely, to him or bearer, or to bearer alone;* without which authority the same could not have been done, by the greatest latitude of the common law, so as to transfer the legal right of bonds or notes, drawn payable otherwise than to the *order* or *assigns,* of the obligee or payee. If made payable to *bearer,* or to A. B. or bearer, (which is the same thing) the legal interest being, according to the common law, assignable by *delivery,* no statute authority was necessary to the validity of the assignment *in that way,* so as to give to the assignee a right of action of some kind : therefore, none was expressed. The further effect of the statute, I conceive to be, that in either mode of legal assignment, (whether by statute or common law) the assignee may sue in his own name, and may maintain *any action,* which the obligee or payee could have done; and the defendant shall be allowed the benefit of all payments, *discounts* or sets-off, existing against the payee or obligee, previous to notice of the assignment. See *Stocking* vs. *Toulman,* as to the parties between whom the matter of defence must exist.

. If it be objected to this interpretation, that it was unnecessary that the statute should have authorised suit, by bearer, in his own name, because it was a common law right, my reply is, that, though he could sue as bearer, doubt and difficulty existed, respecting the *form of action* that he might prosecute—whether the assignment was by delivery or by indorsement; and

the statute tenders him any action which the obligee or payee might or could have sued or maintained thereon previous to assignment." It might also have been deemed necessary to legislate on this point, as well as the others, for the farther reason, that the immediately succeeding language, in the same sentence of the statute, contains the other provisions, not supplied by the common law—" that in all actions to be commenced and sued upon any such assigned bond, note," &c. " the defendant shall be allowed the benefit of all payments, *discounts and sets-off*, made, had, or possessed, against the same, previous to notice of assignment." It is true, as before remarked, that the benefit of *payments made*, was secured by the *common law*, as also the defence of void consideration, against paper *not negotiable*, even in the hands of an assignee; but not so as respects *sets-off*. In this respect, as well as in directing the kind of action, it seems to have been the policy of the statute, to prescribe an equitable rule of right for the government of all bonds and promissory-notes, and to render the mode of proceeding more certain and uniform.

The case of *Raborg* vs. *Peyton*,[a] illustrates the positions last advanced. It was an action of *debt*, brought by the indorsee of a bill of exchange, against the acceptor. The only question was, whether *debt* would lie in such a case.

Mr. Justice *Story*, delivered the opinion of the court, and said, " It is admitted, that in *Hardres*, 485, the court held that debt does not lie by the payee of a bill of exchange against the acceptor. The reasons given for this opinion were, first, that there is no privity of contract between the parties; and secondly, that an acceptance is only in the nature of a collateral pro-

a 2 Wheat. 385

mise or engagement to pay the debt of another, which does not create a duty." He then proceeds to combat the idea of a want of privity of contract, and to shew that " wherever the common law raises a duty, debt lies;" also, that " an acceptance is not a collateral engagement to pay the debt of another, but an absolute engagement to pay the money to the holder of the bill; and that the engagements of all the other parties are merely collateral." He also remarks, that " the old doctrine on this subject has been very considerably shaken in modern times. An *indebitatus assumpsit* will now lie in favor of the payee against the acceptor; and it is generally true, that where such an action lies, debt will lie. And a still stronger case is, that an acceptance is good evidence on a count upon an *insimul computassent*, which can only lie upon the footing of a privity of contract.

But the most important case, is that of *Bishop* vs. *Young*.[a] It was there held, in opposition to what was supposed to have been the doctrine of former cases, that debt would lie by the payee of a note against the maker, where the note was expressed to be *for value received.*" Also, " if an action of debt will lie in favor of the payee of a note against the maker, it is not easy to perceive any sound principle upon which it ought to be denied against an acceptor of a bill. The acceptance of a bill is just as much an admission of a debt between the immediate parties, as the drawing of a note. Again, he says, " In point of law, every subsequent holder, in respect to the acceptor of a bill, and the *maker of a note*, stands in the same predicament as the payee. An acceptance is as much evidence of money had and received by the acceptor, to the use of the holder, and of money paid

[a] 2 Bos. & Pul. 78.

by such holder for the use of the acceptor, as if he were the payee." It is added, that, in adopting a rule consonant to the just rights of the parties, as recognised *in modern times*, "we apply the well settled doctrine, that *debt* lies in every case where the common law creates a duty for the payment of money, and in every case where there is an express contract for the payment of money."

The case of *Grant* vs. *Vaughan*, as well as *Raborg* vs. *Peyton*, shew, that the holder of a note payable to bearer, may, in the nature of his action, and form of his declaration, against the maker, assume to himself, the capacity of the payee; also, that regardless of the form of the action, or the true capacity of the plaintiff, the principles of the common law, and the *equity of our statute* of 1812, permit the maker, when sued, to impeach the consideration of any note which is not purely negotiable.

In the case of *Grant* vs. *Vaughan*, all the Judges held, substantially, that a note payable to one or bearer, is payable in the alternative either to the one or the other, who may hold it as *bona fide* bearer; that either, suing upon it, may assume to himself the attitude, or be treated by the defendant, as payee, and the defence may be regulated accordingly.— Lord *Mansfield*, as we have seen, said, the money due on such note, is held by the defendant for the use of the person who has the note as bearer: and he undoubtedly has a right to recover it, in an action for money had and received. Mr. Justice *Willes* declared, that bearer is *descriptio personæ*, and a person may take by that description, as well as by any other"—that, "it is a contract to pay the bearer, or the person to whom he may deliver it."

WARD SCHOOL LIBRARY

Mr. Justice *Yates* held, that a paper payable to bearer, is, in its nature, payable from hand to hand, *toties quoties.*

[a 1 Camp. 175.] In the case of *Wayman* vs. *Bend*,[a] it was held that a promissory note is evidence under the money counts, only as between the original parties to it; but that in an action against the maker of a note, payable to A. B. or bearer, which had been indorsed to the plaintiff, *it was unnecessary to have stated the indorsement;* but as it had been done, it was to be proved. It has been ruled, in a variety of other cases, that " a promissory note is *prima facie* evidence of money lent by the payee to the maker, or of a balance due from the maker to the payee, upon an account stated," or of money had and received by the maker for the use of the payee.[b]

[b 2 Starkie's Ev 301. e 2 Peter's U S. R. 318.] In the case of the *Bank of Kentucky* vs. *Wister, et al.*[c] the Supreme Court said, " this court has uniformly held, that a note payable to bearer is *payable to any body*, and not affected by the disabilities of the nominal payee," to sue in the federal court.— This is considered authority to establish the position, that one sueing on a *note* as bearer, may be treated as a privy to the original contract.

[d 2 Gall. 560] In the case of *Fales, et al.* vs. *Maycerry*,[d] Story, J. said, whenever the assignees have notice of the nature and circumstances of the claim, they are uniformly held affected by all the legal consequences attached to its original character, *even in respect to negotiable instruments.* And where the instrument is not negotiable, even a want of notice has not been supposed to give validity to the assignment of a *chose in action*; which, as between the original parties, was affected with fraud or illegality."

*Kent,*[e] J. says, " If a note be payable to *B.* or bear-[a] 3 Comm. er, it need not be indorsed ; *and it is the same in ef-*[50.] *fect as if the name of B had been omitted.* The bearer may sue in his own name, on showing, that he came by the note *bona fide,* and for a valuable consideration. So, a bill or note payable to a fictitious person, may be sued by an innocent indorsee, as a note payable to bearer ; and such a bill or note is good, against the drawer or maker, and will bind the acceptor, if the fact that the payee was fictitious, was known to the acceptor.—(See also in support of the [b] 1 H. Bl. latter proposition, *Collins* vs. *Emett*[b]— *Miner* vs. *Gib-* 313. *son.*[c]) *Kent,*[d] J. also remarks, that " possession is 481—and 1 *prima facie* evidence of property in negotiable paper, [d]Comm.51 payable to *bearer,* or *indorsed in blank*; and such a *bona fide* holder can recover upon the paper, though it came to him from a person who had stolen or robbed it from the true owner ; provided he took it innocently in the course of trade, for a valuable consideration, and under circumstances of due caution ; and he need not account for his possession of it, unless suspicion be raised. This doctrine is founded on the *commercial policy* of sustaining the credit and circulation of *negotiable* paper." It should be observed, that the remarks quoted, refer equally to notes " payable to bearer, or indorsed in blank," and are confined to such notes as are *strictly negotiable.* But the same authority, (page 52) says, " as between the original parties to negotiable paper, these provisions in favor of the *bona fide* assignee, do not apply ; and the consideration of a note, bill, or check, may be enquired into." Again, he says,[e] " the holder may strike [e]Comm. 59 out the indorsement to him, *though full,* and all prior [60.] indorsements in blank, except the first, and charge

the payee or *maker*. There is no necessity for any negotiable words in the indorsement. *A bill (and it must be the same with a note) originally negotiable, continues so in the hands of the indorsee,* unless the general negotiability be restrained by a *special indorsement* by the payee. He may stop its negotiability by a special indorsement, but no subsequent indorsee can restrain the negotiability of the bill." .

These principles shew, that paper, which is in its nature and character *negotiable,* may be assigned by indorsement, either in full or in blank, or when payable to bearer, by delivery merely; and that then it becomes entitled to protection as a *negotiable* security in the hands of an innocent holder, ignorant of any objection to its equity, and this is for the benefit of commerce. But yet no sanction is afforded to the argument, that our statute has created, or admitted any distinction as regards their negotiability, between the different forms of promissory notes; or that it has not denied *full* negotiability to them all; or that it has given to the holder of a note payable to himself or bearer, the power to destroy its negotiable effect, by a general indorsement, when by simple delivery it would be preserved. On the contrary, the effect of the foregoing doctrine is, that a note payable *to B, or bearer, is the same as if the name of B had been omitted;* that one holding such note may sue upon it *as payee* or *assignee by delivery;* that if he sue as assignee his rights are the same, whether the assignment was by delivery or by indorsement, and if the note was payable to another or bearer, and indorsed to him, *he may strike out the indorsement and sue as bearer;* and that a paper *originally negotiable, continues so in*

*the hands of the indorsee, unless restrained by a special indorsement, forbidding it, by the payee.*

Then as it is not, and can not be, contended, that our statute recognises the *negotiability* of any paper embraced by it, and it expressly provides for *all promissory notes,* the conclusion appears irresistable, that all must stand on the same principle ; that they are recoverable after *assignment* either by indorsement or delivery, at the suit of the assignee—saving, however, to the maker " the benefit of all payments, discounts, and sets-off."

I conceive the chief error in the contrary construction, to be in the clause of the statute which provides, "that the assignee shall and may sue in his own name, and maintain any action which the obligee or payee might or could have sued or maintained thereon, previous to assignment : and, that, in all actions, to be commenced and sued *upon any such assigned bond, note,*" &c. the defendant shall be allowed the benefit of all payments, discounts and sets-off, previous to notice of the assignment. Had the language been so far different as to have said, "in all actions, to be commenced and sued upon any bonds, notes, &c. *assigned by endorsement,* (or in manner aforesaid) the defendant should be allowed," &c. then bonds and notes, payable to bearer, and assigned by *delivery* would appear to have been excluded from its operation, and left as at common law. But, I think the fair construction of the adjective pronoun, "such," preceding, "assigned bond, note," &c. refers it alone to the kinds of bonds, notes, &c. mentioned in the beginning of the section, as those that might be assigned by indorsement, whether the assignment was contemplated in the body of them or not, by the

words, " or order or assigns ;" and, it will be perceived, that the kinds thus made assignable, are, " all bonds, obligations, bills single, promissory notes, and all other writings for the payment of money, or any other thing"—by which, I understand, that either kind of instrument, to be embraced by the statute, must be for the *payment* of money, or for the *payment* of some other thing, in contradistinction to covenants or articles *to do, or not to do, particular acts*—and hence arose the necessity of qualifying the application of the statute, by limiting it to "such assigned bonds, notes," &c. as should be drawn for the *payment* of money or other things.

This construction seems to obviate every difficulty : to give a just and rational operation to the statute, by protecting the rights of the makers of all bonds and notes, so far as to allow them the benefit of all payments, discounts and sets-off, against the obligees or payees, existing previous to notice of any *legal* assignment. It must also be recollected, that the difficulty of ascertaining the time of assignment, would be the same, whether by indorsement or delivery ; in either case the true time, when material to the rights of the defendant, must be proved, otherwise, than by the date of the indorsement, even should there be one with a date, which is not very usual ; the date of an indorsement, if not the discretionary act of the indorsee, when he comes to sue, is at best, but the act of the payee, to which the maker is not a party ; consequently, it is no evidence against him. This was the doctrine of this court, in the case of *Gross* vs. *Van Wick, et al.*[a]  I do not in the same manner include bills of exchange, and deny to them negotiability ; the distinction is obvious : such secu-

[a] Al. Rep. 7

rities are not named in the statute, and, being the most valuable instruments, and such as are peculiarly commercial and negotiable by the common law, they cannot, according to well established rules of construction, be included by the general description of "all other writings for the payment of money," after the specific enumeration of the inferior instruments; had it been intended to include them, the presumption is, they would have been mentioned, as *all bonds and notes* are. This being a remedial statute, it is entitled to a liberal and equitable construction, which, I think, can be no other than that which I have given it. I have been unable to arrive at a different conclusion, notwithstanding the distrust I have of my own opinion, when opposed, as it is on this point, to those of my learned brothers.

The result, however, is, from the opinion of a majority, in favor of the plaintiff below, on both points, (in the first of which I concur) that the judgment must be affirmed.

TAYLOR, J.—The single error assigned in this case, is, "The court erred in sustaining the demurrer to the defendant's plea."

The suit was originally brought before a justice of the peace, against the plaintiff in error, on a note executed by him and one John Ethridge, to Nancy Crenshaw or *bearer*, for thirty-seven dollars and fifty cents. A judgment was rendered, by the justice, against the defendant below, from which he appealed to the county court. In that court the following plea was filed. "The defendant pleads, in short, that the note above described was given on an illegal contract, and which was against public policy,

viz : a prosecution for bastardy was then pending, instituted against John Ethridge, for getting the said Nancy Crenshaw with·child; and it was agreed between the said Nancy and the said Ethridge, that said prosecution should be stopped, and that she should not appear, to swear said child against him : and upon no other consideration was said note given." To this plea the plaintiff demurred, and the demurrer was sustained.

It is insisted by the plaintiff in error, that the plea shows, that the consideration for which the note was given, is an illegal one. The defendant contends, that the consideration is legal; but, if it were not, it will not prevent a recovery, as it is a commercial instrument, being made payable to bearer—and this defence cannot be made against the present holder.

In order to ascertain whether the consideration was illegal, it is necessary to examine the object of the statute, which authorises the proceeding against the putative father of a bastard child, which had been commenced in this instance. It will be conceded, and, as I understood the defendant's counsel, was admitted, in the argument, that, if the object of the statute, is to secure the state or county against a charge, to which it might, otherwise, be subject, the proceeding is in the nature of a public prosecution; and any agreement to prevent it, is contrary to public policy, and void. Indeed, it is perfectly immaterial what the mode of proceeding may be, the object intended to be effected by the framers of the statute, is, alone, to be considered : and, if that was to secure the public interest, and not to give, or provide a remedy to enforce a private right, no compromise of that interest could be made.

It is useless to enter into a long discussion and examination of authorities, on this subject; the principle is universally acknowledged.

The 1st and 2d sections of the statute are in the following words: "When any single woman, who shall be pregnant, or delivered of a child, which, by law, would be deemed and held a bastard, shall make complaint to any one or more justices of the peace, for the county where she may be so pregnant or delivered, as aforesaid, and shall accuse any one of being the father of such child, it shall be the duty of such justice or justices, to issue process to the sheriff or coroner, or any constable of such county, against the person so accused, as aforesaid, and cause him to be brought before him.—That, upon his appearance, it shall be the duty of such justice or justices, to examine the said female, in the presence of the man alleged to be the father of the child, touching the charge against him ; and if said justice or justices shall be of opinion that sufficient cause appears, it shall be his or their duty, to bind the person so accused, in bond, with good and sufficient security, to be and appear before the next county court, to be holden for said county ; and, in the mean time, to be of good behaviour."

All the requisites of a public prosecution are contained in such a proceeding. It is not a suit instituted by the mother, which is provided; but a warrant, in the name of the State, is the only process which the justice could issue, when the complaint is made. The person against whom the proceeding is instituted, is not termed "the defendant," but the statute speaks of him as "the accused;" and the justice is to exercise his judgment in discharging "the accus-

ed," or in binding him in a bond, with sufficient se-
curity, to appear at the next county court," &c.   If
it were a provision intended to enable a woman, pre-
sumed to be too poor to prosecute her own rights, to
obtain redress for the injury done her, this discretion
would not be left with the justice, but the right would
be given her to have a trial in court.   But the addi-
tional provision, that "the accused" shall enter into
bond for his good behavior, tends much to confirm
the opinion, that this is a public prosecution.   If,
however, there could be any doubt on this subject,
the provisions contained in the fourth section, in my
mind, remove it entirely.   The third section requires
an issue to be made up, to try "whether the reputed
father, is the real father of the child, or not;" and the
fourth section goes on to declare, that, if the issue is
found against the reputed father, he shall be " con-
demned," by the judgment of the court, to pay, not
exceeding fifty dollars, at the discretion of said court,
yearly, for ten years, towards, the support, mainten-
ance and education of said child : "and the said im-
puted father shall give bond and security, for the due
and faithful payment of said sum of money, which
shall be made payable *to the said court,* and laid out,
and appropriated, under their special order and di-
rection, from time to time made, *so the same be not
paid to the mother of said child.*"   No express lan-
guage could have more clearly satisfied me of the in-
tention of the legislature, in enacting this statute.—
It was evidently to secure the county against the lia-
bility of having to support such child, as a pauper.
The money is to be paid to the county court, to be
laid out, under the direction of that court, for the be-
nefit of the child ; and the court is expressly prohi-

bited from paying it to the mother. In addition to this, the provision is to be made until the child is ten years old; an age at which he or she can be bound out, so as to free the county from all danger of being subjected to a charge.

It, then, appears to be the true policy of the law, that such prosecutions should take place, and that expenses attendant upon the support of such children, should be paid by those who, in justice, should bear them.

But it is said, in opposition to this inference, that the statute contains no compulsory provisions—that the mother is left to her own volition, and may either prosecute the putative father or not, as she pleases; and that as this is the case, she may abandon the prosecution when she pleases.

Even if this were the true construction of the statute, I do not know that it would weigh much in favor of the legality of such a contract. Generally, in cases of misdemeanor, no one is compelled to become a prosecutor or informer. It may be replied, the law makes it the duty of every citizen, who knows of such offence, to have the offender borught to punishment. Admit tt, and I would say, in return, that it is the duty of a woman, having a bastard child, to take the steps prescribed by the statute. But, I do not admit, that, when once she has exhibited the charge, she can, at pleasure, abandon it; I believe she might be compelled to attend and give evidence. But there are several reasons, perfectly consistent with the positions assumed, which may be assigned for its being left discretionary with a woman in this situation, either to *commence* a prosecution or not. Some might be perfectly able to support their chil-

dren without aid, out of an ample property of their own ; some again might be deceived by the wiles of an artful seducer, and still retain too much modesty, willingly to be exposed as a spectacle to a gazing crowd. In such instances it would be cruel to *force* an information, although the policy of the law might impose it as a duty.

A sure test by which to try the legality of this contract is to ascertain whether or not it is obligatory on the woman. Was she 'bound by the agreement set out in the plea, not to appear and testify. If she was not, there can be no ground for sustaining the action. The object of the prosecution is to secure an adequate provision for the child. It is not to be recovered by or paid to the person who made this agreement, but the county court is to receive the amount of the recovery. Can we view the mother as any thing more than a witness for the state? It seems to me that she clearly stands in that relation to the prosecution, and that a witness in any other prosecution or suit would be equally authorised to enter into a stipulation, with a party, against whom he was summoned to give evidence, to absent himself from the trial. And would a suit brought to recover the amount agreed to be paid a witness for such a consideration, whether he was summoned in a suit between individuals, or between the state and an individual, be tolerated for a moment? But after a witness had entered into such an agreement, and received his reward, he would be just as competent as before. So, in this case; the woman, after the execution of this note to her, could have testified in the suit, and none could have hindered her. It would have been a most strange proceeding, if, when she came forward for that purpose,

the defendant in the prosecution had objected to her,
on the ground of the contract; and still more strange
had the objection been sustained : the observation of
Judge *Hale* to the counsel, in a cause on trial before
him, might have been most appropriately repeated :
"You have a rare case of it." But suppose the mo-
ney had been paid to her, and she had violated her
agreement, by coming forward and giving evidence.
If the contract had been legal, the injured person
would have had his action for damages. I would
be glad to see the declaration, which his attorney
would file in the cause. It would probably have run
somewhat as follows : "For that, whereas, it was
agreed between the plaintiff and defendant, for, and
in consideration of the sum of a hundred dollars,
paid by the plaintiff to the defendant, that the defen-
dant should not give evidence against the plaintiff,
in a certain prosecution then depending, at the in-
stance of the State, against the plaintiff; yet, the said
defendant did not keep and perform her said promise,
so made to the plaintiff, as aforesaid, but violated the
same, in this, that she did appear, and testify against
the plaintiff in said prosecution; by reason whereof
he was convicted, &c., to the damage of the plain-
tiff," &c. I think, the plaintiff's prospect of suc-
cess, in such a case, would be gloomy, indeed : and
this is not an unwarantable view of the case. If
the witness fulfilled the agreement, and can reco-
ver her reward; had she violated it, she would have
been liable to a suit—and to a suit of the very kind
which I have briefly set out in the foregoing form of
a declaration.

The case of *Wheeler* vs. *Russell,* most forcibly [a]17 Mass.
shows, how entirely courts will discountenance ac- Rep. 258.

tions brought on agreements which tend to violate a policy which is sustained by law. In that state, a statute forbids the sale of shingles, unless they are of a particular description. The plaintiff had sold to the defendant some shingles, which were not of the kind required by the statute, and received his note for the amount agreed to be paid for them. There was no fraud on the part of the plaintiff: he effected no imposition on the defendant, not having represented the shingles to come within the statute; yet the court determined, that on this contract, he could not recover.

Numerous other cases might be cited, to shew that courts will never give effect to contracts, made in violation of the policy of a public law, and intended to defeat its operations. But to permit a witness to enforce an agreement, the consideration of which was, that he would not testify in a cause, is, in my opinion, making a decision of dangerous tendency.

I therefore, am decidedly of opinion, that the consideration stated in the plea, as the one for which the note was given, is against public policy.

I proceed to the second question, viz: can the illegality of the consideration affect the validity of the note in the hands of the present plaintiff?

I shall not attempt to examine whether promissory notes were negotiable in England, before the celebrated statute, which was produced by the decisions of Lord *Holt*, against their negotiability. However, that may have been, it is certain that our act of 1812, "concerning the assignment of bonds, notes," &c. places promissory notes, generally, on the same footing with "bonds, obligations, bills single, and all other writings for the payment of money, or any other

thing;" and merely renders them *assignable*, giving a right of action to the assignee in his own name. The only question is, are notes made payable to *bearer*, included in the terms, or in the reason of that statute?

Our legislature seems to have considered the statute of *Anne* necessary to render notes payable to *order*, negotiable; for, in the year 1807, that statute, with some variation, extending its provisions to cotton receipts, was substantially enacted here.— But the act of 1812, just referred to, repealed the statute of 1807, so far as its provisions affected promissory notes. By the act of 1812, it is provided, "that all bonds, obligations, bills single, *promissory notes*, and all other writings for the payment of money, or any other thing, shall and may be hereafter *assigned by indorsement*, whether the same be made payable to the order or assigns of the obligee or payee, or not; and that the assignee shall and may sue in his own name, and maintain any action which the obligee or payee might or could have sued or maintained thereon previous to assignment; and that in all actions to be commenced and sued upon any such assigned bond, obligation, bill single, promissory note, or other writing as aforesaid, the defendant shall be allowed the benefit of all payments, discounts and sets-off, made, had, or possessed against the same, previous to notice of the assignment," &c.

This court has uniformly determined, that this statute authorised the obligor, payor, &c. to plead any defence in an action brought by an assignee of any of the instruments included in the statute, that he could against the obligee or payee, and, whether pro-

missory notes payable to *order*, were negotiable by the law merchant, or not, that their negotiability is now restrained in this state, and that an assignee has only the rights designated in the statute.

But we are to determine, whether or not the statute embraces promissory notes payable to *bearer*.

The object of the statute is, to give a right of action to the assignees of the different instruments described in it, to convert an equitable into a legal interest, and, while it does so, to secure the makers of such instruments all equitable defences. But the intention of enabling the *assignee* to sue, could have no application to the holder of a note payable to *bearer*. His right to sue in his own name, had never been seriously questioned in England, nor in any state of this union. Nor was an assignment ever deemed necessary to vest this right of action. Any holder could sue as the bearer, to whom the note was payable.— But it is said the statute expressly includes all promissory notes, &c. " whether made payable to order or not." This language is certainly used by the statute, but there was evidently no intention to require instruments to be " assigned by endorsement," the legal right to which, passed by mere delivery before, to convert a note payable to *beorer* into one payable to order ; but the object was to enlarge the power of the obligee or payee. In England, it has uniformly, down to the present time, been determined, that no note was negotiable unless the words " or order" " or bearer," or some other words expressly authorising the payee of a bill, or note, to assign it, be inserted therein, unless the negotiable words were omitted by mistake. To prevent a construction of the statute leading to a similar doctrine, with respect to the as-

signability of the instruments described in our statute, this language was used. So, that under this act, all "bonds, obligations, promissory notes, &c. for the payment of money or any other thing," are assignable, so as to vest the legal interest in the assignee, whether the instrument on its face, gives an authority to assign or not; and in giving this legal right to assignees, notes payable to bearer were not intended to be included.

And this court has, by a uniform train of decisons, sanctioned this construction. If it be incorrect, a note payable to *bearer* must be *assigned by indorsement*, before a transferee could sue on it in his own name, because the statute gives the right to such assignee, and him only. But this has never been contended for. Suits have, in such cases, always been brought in the name of the *bearer*, and no doubt, has ever been expressed, in this court, of the correctness of this course : indeed, it would be absurd to indorse such notes as are made payable to bearer.

I think, therefore, that the statute does not embrace a note of this description. Has the payee a right to make this defence against the holder, a transferee, at common law ?

Such a defence, it is admitted, could not be made against the assignee of a negotiable instrument : it is not one of those considerations, which, like usury, totally vitiates and destroys a security ; but, it is a consideration against public policy, which policy, while it condemns the transaction, and renders the security voidable, in the hands of an original party, may be best promoted, by making it valid, when the property of an innocent third person.

In *Chitty on Bills*,[a] it is laid down, that "a bill or    a Page 83

note, payable to J. S. or bearer, is, in legal effect, payable to the bearer, and J. S. is a mere cypher."

In the case of *Grant* vs. *Vaughan*, decided by the court of King's Bench, in 1764,[a] the questions of the negotiability of a note, payable to *bearer*, and of the right of the holder, being a transferee, to sue in his own name, are discussed, and examined at length.— All the authorities on the subject, are reviewed, and go clearly to sustain the negotiability of the paper, and the legal interest of the holder; and the court unanimously decided in favor of a plaintiff, thus situated.

It may be well to remark here, that the statute of 3 and 4 Anne, ch. 9, does not, in any way, increase the powers of the holders of such paper. The right to sue, in his own name, is given to the assignee of a promissory note, made payable to *order;* but no such right is given to the holder of a note, made payable to *bearer*. It is true, that Lord *Mansfield* observes, in the case of *Grant* vs. *Vaughan*, " The act of 3 and 4 Anne, ch. 9, puts promissory notes upon the same foot, throughout, with inland bills of exchange. And, therefore, whatever is the rule, as to inland bills of exchange, payable to bearer, must be so, likewise, as to notes, payable to bearer. Great force arises from the act of parliament, putting notes merely upon the foot of inland bills of exchange, and particularly specifying notes, payable to bearer."— But this observation is made after the negotiability of the paper is sustained, by reason and authority, without reference to the statute. And the other judges, although they refer to the statute, as settling any doubt, yet clearly hold, that, without it, the action could be sustained. But the general ground ta-

[a] 3 Burr. 1516.

ken in that, and all the other cases, is, that the contract to pay, in legal effect, is made with the bearer.

The cases decided in the United States, are believed, without exception, to have sustained the same doctrine. The Supreme court of the United States, in the case of *The Bank of Kentucky* vs. *Wister & Co.*[a] observe—"This court has uniformly held, that a note, payable to bearer, is payable to any body, and not effected by the disabilities of the nominal payee." The doctrine, then, that a note payable to *bearer*, is, in law, the property of the holder, and may be sued on, in his name, is a common law doctrine, not arising out of the negotiabity of the paper, so much as the agreement expressed upon its face, to pay any person to whom it may rightfully come. It is, from the nature of the contract, and not the law-merchant, that this liability of the payor arises—the promise, itself, being an engagement, not to pay A. B., but the holder.

The decisions of the Supreme court of the United States, forcibly sustain this opinion. By the constitution of the United States, citizens of different States may sue each other in the Federal courts, but those of the same State cannot. It has been uniformly determined, by those courts, that the assignee of a note, payable to order, has no greater privilege, in this respect, than the payee; that is, if the payor and payee are citizens of the same State, and the assignee of another, that no suit can be maintained in the Federal courts: nor does the negotiability of the paper, in the State in which it was made or asigned, make any difference. But if a note be made payable to *bearer*, by a citizen of one State, and given to another citizen of the same State, and a citizen

[a] 2 Peters, 318.

of another State becomes the holder of it, he may sustain a suit in a Federal court. Nothing could more plainly show the ground of these decisions; and, that it is not simply the negotiability of the instruments.

It is a common thing for a note to be executed to " the bearer," without specifying the name of any payee. To permit defences, like the one attempted in the present action, in cases of this kind, when a third person was the holder, would be extending the investigation to a tedious length.

By giving such a note, the payor invites any and every person to become the holder, and promises to pay whoever may be so, without regard to the original consideration, or the situation of accounts, between 'him and the person to whom it was first given: and, it would be most impolitic and vexatious, to permit evidence to be introduced on the trial, of who the original payee was, the consideration, and the state of accounts, not only between him and the payor, but between him and every subsequent holder, with the view of establishing an off-set against some one or more of them.

But, it may be objected, that our statute, of 1807, similar to that of 3rd and 4th Anne, which was repealed by that of 1812, varied from that of Anne, in this—that, notes, payable to *bearer*, were expressly made negotiable, by that statute, as well as those payable to *order:* and, when the legislature, in the repealing act, use the words, " promissory notes, whether the same be made payable to order, or not," it must have been intended, to include every kind of note, particularly all those embraced in the statute which this act repealed.

I cannot see, however, that this objection is entitled to any weight: if this had been intended, nothing would have been easier, than for language to the following effect, to have been used : "Promissory notes, whether the same be made payable to order or bearer, or not;" and, the very circumstance, that the word "bearer," was used, in the repealed statute, renders it more probable, that it was designedly omitted, in the one repealing it.

In all instances, however, the plaintiff who sues, as bearer, should be an honest and *bona fide* holder of the note; but this will be presumed, unless something to excite suspicion, appears in the progress of the suit.

I am, therefore, of the opinion, that the defence set up by the plea, would be available, between the original parties ; but could not be used against an innocent third person, who had fairly and honestly become the holder of the note.

LIPSCOMB, C. J.—I concur with Judge *Saffold,* on the first point—that is, that the consideration is sufficient: and, I concur with Judge *Taylor,* on the second—that the defence offered, could not be set up, against an innocent holder.